NOTICE
Decision filed 05/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250815-U

NO. 5-25-0815

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* S.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-32 |
| | ) | |
| Marie J., | ) | Honorable |
| | ) | Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We reverse the judgment of the circuit court terminating the respondent mother's parental rights, where the circuit court's findings that she was an unfit person were contrary to the manifest weight of the evidence.

¶ 2   The respondent, Marie J. (Mother)[1], appeals the Macon County circuit court's judgment terminating her parental rights over her minor child, S.R. On appeal, Mother challenges both the finding of unfitness and the determination that it was in the minor's best interests to terminate her parental rights. For the reasons explained below, we reverse the judgment of the circuit court

---

[1]S.R.'s father was a party to case No. 2022-JA-32 but is not a party to this appeal.

1

terminating Mother's parental rights, where the circuit court's findings that Mother was an unfit parent were contrary to the manifest weight of the evidence.

¶ 3                                    I. BACKGROUND

¶ 4    On February 15, 2022, the State filed a petition for adjudication of wardship regarding S.R., who was born in August 2020 and was approximately 17 months old at the time of the filing. The petition alleged S.R. was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) as a minor who was "under 18 years of age whose environment is injurious to her welfare, in that both parents have ongoing mental health issues that are not under control." The petition also alleged S.R. was abused under section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)) as a minor who was at substantial risk of physical injury, by other than accidental means, because "both parents have ongoing mental health issues that are not under control."

¶ 5    A shelter care report prepared by the Illinois Department of Children and Family Services (DCFS) was filed on the same day. The report indicated that on February 14, 2022, DCFS received a report regarding S.R., and her siblings, G.G. (aged 2, born August 2019) and G.R. (approximately 3 months old, born November 2021)[2], after Mother called the Decatur Police Department (DPD) and asked the police to buy her a new home and car because hers were possessed.

¶ 6    Shimeka Foster, a Child Protection Specialist (CPS) with DCFS, reported to the home of Mother and Father on February 14, 2022. Foster spoke with Sergeant Earles of the DPD, who reported that he responded to Mother's call. When Sergeant Earles arrived on the scene, Mother was yelling, "There is only one God," and Mother reported that God was speaking through her.

_____

[2]G.G. and G.R. are not parties to the present appeal. The shelter care report indicates that separate juvenile cases were opened for G.G. and G.R.

2

Mother reported to officers on the scene that she had not slept in three days and had been fasting for four days. A worker from Heritage Behavioral Health Center (HBHC) arrived at the home "to access [*sic*] [Mother]," and Mother agreed to go to the hospital for further assessment.

¶ 7    Foster attempted to interview Father, but he did not seem to understand what she was asking him. Foster noted that during the conversation, Father repeatedly lost focus, appearing "as if he was not in the room," and seemed disoriented. When asked about Mother's behavior, Father stated that she was experiencing a spiritual awakening. Foster informed Father that DCFS was removing the children from the home, and he replied, "okay." The three minors were taken into protective custody on February 14, 2022.

¶ 8    A shelter care hearing[3] was held on February 15, 2022. Father was present, and counsel was appointed to represent him in the matter. Mother was not present; however, it was stated to the court that she was in the hospital. The circuit court found probable cause to believe the minor was neglected, abused, or dependent, and it was a matter of immediate and urgent necessity that the minor be placed in shelter care. A temporary custody order was entered on the same day.

¶ 9    On March 24, 2022, a family service plan was filed by DCFS. The service plan recommended that Mother complete services for substance abuse, parenting, mental health, domestic violence, and personal stability and cooperation. Regarding substance abuse services, Mother was to complete a full substance abuse assessment with a qualified service provider and follow all recommended services. Mother was further required to submit to random drug screenings and refrain from substance use. As for parenting, Mother was to complete a parenting pre-test and follow any recommendations. As to mental health services, Mother was to follow all

---

[3]A transcript of the February 15, 2022, shelter care hearing is not contained within the record on appeal. The information regarding this hearing comes from the circuit court's docket entry regarding same.

recommendations made by her mental health provider. Mother was to complete a domestic violence assessment and follow all recommendations. Lastly, Mother was to demonstrate her own overall stability to ensure the minor's needs would be met. Overall stability included Mother maintaining safe and stable housing, maintaining a legal source of income, keeping DCFS updated on any address changes, meeting with DCFS to ensure progress, and signing all releases.

¶ 10     On March 30, 2022, the adjudicatory hearing[4] was held. Father was present with counsel, and mother was present *pro se*. The circuit court heard witness testimony. The State withdrew count II of the petition for adjudication of wardship. The circuit court found the allegations of count I had been proven by a preponderance of the evidence, and found the minor was neglected. On April 11, 2022, the written adjudicatory order was entered. The order found the minor was neglected as a minor in an environment that is injurious to the welfare of the minor as defined under section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)). The court noted the finding was based on the presence of mental health problems. The order further noted that the neglect was inflicted by both Mother and Father. A dispositional hearing was scheduled on April 20, 2022.

¶ 11     On April 13, 2022, a dispositional report was filed by DCFS. An initial child and family team meeting was held on March 23, 2022, to discuss the service plan recommendations. Mother and Father were both in attendance. Mother was recommended "to engage in parenting services, mental health services, domestic violence services, complete a substance abuse assessment, and maintain a goal of personal stability throughout this case." Mother was also required to keep in contact with DCFS workers and inform them of any changes pertaining to her living or

---

[4]A transcript of the March 30, 2022, adjudicatory hearing is not contained within the record on appeal. The information regarding this hearing comes from the circuit court's docket entry regarding same.

4

employment situation. Both Mother and Father were required to comply with their visitation plan and provide safe and appropriate interactions during all visits.

¶ 12   The report stated that Mother and Father resided together in a two-bedroom home, which the worker observed to be clean and met minimal parenting standards. Mother was employed at a nursing home. Mother was referred to family habilitation services to assist her in obtaining community resources, budgeting, and rent assistance, should she need it.

¶ 13   Mother was referred to parenting services through Webster Cantrell Youth Advocate (WCYA), and she completed a parenting assessment on March 23, 2022. Mother scored in the medium risk range in all categories except in power roles, where Mother tested in the low risk range. Mother was recommended for weekly parenting classes beginning on April 20, 2022. At the time of the report, Mother had not made progress in parenting services due to the sessions not yet beginning.

¶ 14   Mother was recommended to engage in mental health treatment. Mother had been engaged in hour-long counseling services every other week at HBHC since her mental health crisis in February 2022. Mother's counselor, Chloe Schaffer, reported that Mother was diagnosed with bipolar disorder and was not recommended for medication. Mother referred to her February 2022 mental health crisis as a "spiritual awakening." Mother was involuntarily admitted to St. Mary's Hospital due to paranoia and aggressive behavior. Mother had been referred to WCYA for counseling services, so Mother's mental health needs could be met through a provider that was familiar with the DCFS process. DCFS recommended that Mother undergo more frequent and intensive sessions to mitigate any future concerns of Mother's mental health impacting her ability to parent her children. At the time of the report, Mother had not made significant progress in mental health treatment.

5

¶ 15    Mother was recommended to engage in domestic violence victim services due to a history of domestic violence incidents between Father and herself. Mother was to be referred to the Dove's Domestic Violence 101 class; these services had not yet begun at the time of the report. Mother was also recommended to engage in a substance abuse assessment and follow any recommended services, if deemed necessary.

¶ 16    Regarding the minor, the report noted that the minor had been diagnosed with Down syndrome and a heart defect. Mother and Father were both attending a weekly, two-hour visit with their children. Both parents had attended all scheduled visits since the case opening, and their interactions with the children had been appropriate. The report recommended the goal of return home within 12 months.

¶ 17    A dispositional hearing[5] was held on April 20, 2022. The circuit court found it was in the best interest of the minor to make her a ward of the court, and guardianship was placed with DCFS. On April 25, 2022, the written dispositional order was entered.

¶ 18    On September 9, 2022, an initial permanency report was filed. Two child and family team meetings took place on May 24, 2022, and September 7, 2022. Mother and Father attended both. The meetings were to discuss their progress and/or lack of progress in services. Mother's recommended services remained to be the following: "domestic violence victimization services, parenting, mental health services, complete a substance abuse assessment, and personal stability and cooperation."

¶ 19    As to parenting, the report stated that Mother completed the intake and preassessment on March 23, 2022. Mother was working on the Illinois Nurturing Parenting curriculum and had

---

[5]A transcript of the April 20, 2022, dispositional hearing is not contained within the record on appeal. The information regarding this hearing comes from the circuit court's docket entry regarding same.

attended four of nine appointments. One appointment was canceled due to COVID-19 exposure, and the remaining three were no-shows.

¶ 20　Regarding mental health services, Mother was referred to WCYA for mental health services at the onset of the case. Mother had begun engaging in mental health services. At the time of the report, Mother had not made significant progress in mental health treatment.

¶ 21　As to domestic violence victimization services, Mother completed her intake on July 6, 2022. Mother had participated in domestic violence services in June and August 2022. Additional information regarding these services was not available at the time the report was prepared.

¶ 22　Mother had not yet completed a substance abuse assessment. Mother reported that she planned to complete a walk-in assessment at HBHC on September 8, 2022. Mother tested negative for all substances at a drug screen on May 20, 2022. Mother failed to appear for random drug screenings in June and August 2022.

¶ 23　Regarding personal stability and cooperation, Father and Mother continued living together in a two-bedroom home that was clean and met minimal parenting standards. Mother was employed at a nursing home where she worked third shift. Mother was also attending classes at Richland Community College. Mother had been in contact with DCFS and had made herself available for meetings. Mother reported she struggled to budget, so a referral was to be made to WCYA for family habilitation services to assist with creating a monthly budget.

¶ 24　As to visitation, Mother attended 6 of 10 offered visits; 2 visits were held virtually due to the children being ill; 4 visits were canceled due to it raining, Mother sleeping, or no reason. At the visits Mother attended, she engaged and played with the children. Mother brought snacks and drinks for the minors, changed their diapers, and styled their hair.

¶ 25    On September 21, 2022, a permanency review hearing was held, and a permanency order was entered, which set the permanency goal as return home within 12 months. The order noted "parents off to slow start, but are making progress." The circuit court found Mother had made reasonable efforts towards the return home of the minor, but had failed to make reasonable and substantial progress toward the minor returning home.

¶ 26    Subsequent permanency review hearings were held, although no permanency review hearing transcripts are present in the record on appeal. Permanency orders were entered on March 22, 2023; September 6, 2023; March 6, 2024; September 4, 2024; and March 5, 2025.

¶ 27    The March 22, 2023, permanency order maintained the goal of return home within 12 months and noted this goal was selected and the other goals were ruled out because "Mother making some progress, Father none." The order further found that Mother had not made reasonable and substantial progress toward returning the minor home, nor had Mother made reasonable efforts toward returning the minor home.

¶ 28    The September 6, 2023, permanency order maintained the goal of return home within 12 months and noted this goal was selected and the other goals were ruled out because "Mom needs to make more progress, Dad doing nothing." The order further found that Mother had not made reasonable and substantial progress toward returning the minor home; however, it found that Mother had made reasonable efforts toward returning the minor home.

¶ 29    The March 6, 2024, permanency order maintained the goal of return home within 12 months and noted this goal was selected and the other goals were ruled out because "Mom doing well, housing an issue for the kids." The order further found that Mother had both made reasonable and substantial progress toward returning the minor home, and Mother had made reasonable efforts toward returning the minor home.

¶ 30    An updated family service plan was prepared by DCFS on August 9, 2024, and filed with the circuit court on November 14, 2024. The August 9, 2024, service plan and the initial service plan from March 2022 are the only service plans contained within the record on appeal. The August 2024 plan contained the same service recommendations as the initial plan: parenting, mental health services, domestic violence victimization services, complete a substance abuse assessment, and personal stability and cooperation.

¶ 31    As to parenting services, the plan noted that Mother completed 41 parenting sessions and all 16 parenting competencies in the curriculum. Mother "was successfully closed out of parenting services on 10/2/23."

¶ 32    Regarding mental health services, the most recent report the caseworker had from Mother's counselor provided that "At this time, I do not have any mental health concerns regarding [Mother.] I believe the incident that required hospitalization was a onetime event, as there have been no other indications of these symptoms." Regarding attendance of mental health services, the following was contained within the service plan:

> "The following update was provided through July of 2024. Dates of Contact with Client/Family: 07/02/2024—cancelled by staff, 07/08/2024—individual therapy, 07/25/2024—cancelled by staff. *** [Mother] has completed one therapy session in July. This is due to staff cancellations, and possibly a miscommunication within the office. [Counselor] will be in contact with [Mother] to establish a schedule that works for both parties."

The counselor recommended that Mother would benefit from continuing therapy as a means of support throughout the adjustment process of her children being returned home.

¶ 33   As to personal stability and cooperation, Mother continued to work at a nursing home Friday through Sunday from 7 pm to 7 am. Mother was working with a housing advocate to move into a 2-bedroom apartment. Mother's apartment was "always clean and put together."

¶ 34   Regarding domestic violence services, Mother was approved to continue domestic violence services on an every other week basis. Mother reports she had gone through the curriculum twice. Mother had not been involved in a domestic violence incident since Father was arrested in August 2023. Mother denies having any contact with Father since his arrest and states she does not plan to seek out a relationship with him if he is released. Mother "attempted to receive an OP against [Father]; however, it was denied." The service plan stated, "[Mother] has successfully completed her services for Domestic Violence."

¶ 35   As to substance abuse, the service plan noted that Mother completed a substance abuse assessment at HBHC on March 21, 2023. Mother was not recommended for substance abuse services.

¶ 36   The September 4, 2024, permanency order maintained the goal of return home within 12 months and noted this goal was selected and the other goals were ruled out because "Mother doing very well; housing still a concern." The order further found that Mother had both made reasonable and substantial progress toward returning the minor home, and Mother had made reasonable efforts toward returning the minor home.

¶ 37   The March 5, 2025, permanency order changed the goal from return home within 12 months to substitute care pending determination of termination of parental rights. The order further found that Mother had not made reasonable and substantial progress toward returning the minor home, nor had Mother made reasonable efforts toward returning the minor home.

¶ 38    On March 13, 2025, the State filed a "motion seeking finding of unfitness and permanent termination of the parental rights" regarding Father and Mother. The motion alleged that Mother was an unfit parent based on the following:

"4. That the [Mother] and [Father] and Unknowns are unfit persons within the meaning of Chapter 750, Section 50/1 of the ILCS as amended, because:

\* \* \*

B. Pursuant to 750 ILCS 50/1(D)(b), [Mother] and [Father] have failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare;

\* \* \*

D. Pursuant to 750 ILCS 50/1(D)(m)(i), [Mother] and [Father] have failed to make reasonable efforts to correct the conditions that were the basis of the removal of the minor from the parent during any 9-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987;

E. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: March 30, 2022—December 30, 2022;

F. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: December 30, 2022—September 30, 2023;

G. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period

11

following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: September 30, 2023—June 30, 2024;

      H. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: June 13, 2024—March 13, 2025."

¶ 39    On July 7, 2025, the circuit court held a fitness hearing. Laura Voyles, child welfare specialist for DCFS, testified for the State. Voyles stated that she had been the assigned caseworker to Mother's case since October 2024 and had reviewed the file from before her assignment. Voyles testified that the case began in 2022 due to both parents' mental health issues. Mother's service plan required that she engage in services for parenting, substance abuse, mental health, and domestic violence, maintain stability, and attend visitation.

¶ 40    Regarding parenting services, Voyles testified that Mother was referred to parenting services at WCYA, and she began those in April 2022. In April and May 2022 Mother attended four of nine offered parenting appointments. Mother's attendance at parenting services improved in June and July 2022. The parenting instructor changed sometime from August into September 2022 due to changes in WCYA's personnel, which placed this service on hold until a new instructor was available. The new instructor began working with Mother on September 30, 2022. Father and Mother ended their romantic relationship in November 2022 and stopped attending parenting services together. After the romantic relationship with Father ended, the parenting instructor reported that Mother's engagement with lessons seemed to be improving.

¶ 41    As of February 1, 2023, Mother was to "Competency 9 of Nurturing Parenting." Voyles explained that Nurturing Parenting was the name of the classes that teach hands-on skills for people

12

to parent their children effectively. There were 16 total competencies in the program. After completing the ninth competency, a new assessment is conducted to see if the student needs the second half of the program, consisting of the remaining seven competencies. Voyles testified that while the time to complete the first nine competencies varies, it should be able to be completed within a "few months at minimum." Mother was recommended to continue with the remaining competencies. As of May 23, 2023, Mother had progressed to "Competency 10.3 for Nurturing Families." The instructor was pleased with Mother's attendance, but was concerned about seeing Father at the office at the same time that Mother was there. Mother was successfully discharged from parenting services on October 3, 2023.

¶ 42   Mother was referred to additional parenting support and resources in December 2024 following ongoing concerns reported from visitation workers. Mother was referred to "Primed for Life" and "Baby Talk," in December 2024. Voyles testified that, initially, Mother was not engaged with Primed for Life, but Mother began services at Primed for Life in March 2025. Mother did not engage in services at Baby Talk.

¶ 43   Regarding visitation, Voyles testified that Mother's attendance at visitation in 2022 was very good. There were two visits that occurred between March 23, 2022, and August 10, 2022, in which the minor was served food that contained red dye, to which the minor was allergic. Mother was aware of the allergy and had received coaching on it. In April 2023 Mother missed five consecutive visits. Mother reported that she was unable to attend the visits due to exposure to Covid-19, transportation issues, and involvement in an altercation with Father. As a result of missing five consecutive visits, Voyles testified that a reengagement meeting was needed to reiterate rules and scheduling expectations. In May 2023 a requirement to confirm visits 24 hours in advance was imposed. Mother missed a visit in May 2023, June 2023, and August 2023 as a

13

result of not confirming within the required time. Other than the eight missed visits already noted, Mother engaged in all visits.

¶ 44    Concerns with the minor eating at visits continued. The minor had a number of health conditions, so attention was needed to ensure she ate slowly, chewed, and did not eat or drink anything containing red dye. Mother's visitation included multiple children. Mother continued to bring food and beverages with red dye to visits, and did not prevent the minor from accessing them. This issue improved into the fall of 2023 and into early winter of 2024, and no incidents with red dye were noted during this time.

¶ 45    In the summer of 2024, visitation began taking place in Mother's home. Voyles testified that visitation in Mother's home initially went well, but there were a few times when a visit worker noted one of the "children grabbed a vape pen." The worker intervened and removed it from the child and spoke with Mother about making sure those items were not accessible to the children.

¶ 46    By late summer 2024 into early fall 2024, the youngest two of Mother's children[6] had been physically returned to Mother's care while guardianship remained with DCFS. In May 2024 S.P. was placed back with Mother, and G.R. was placed back with Mother in August 2024. Voyles testified that after G.R. was returned to Mother's care, visit workers reported concerns regarding all of the children. Specifically, Voyles reported that in the fall of 2024 or early winter of 2025, an incident occurred at a visit where S.R. grabbed a banana, put it in her mouth, and began to choke. The visit worker had to point this out to Mother, and the worker reported feeling that Mother did not act quickly enough to mitigate the choking. Another concern was inattentiveness to S.R.'s needs regarding potty training. Mother would change the pull-up the minor was wearing. However,

---

[6]Mother's children include G.G. (born August 2019), S.R. (born August 2020), G.R. (born November 2021), S.P. (born December 2023), and M.C. (date of birth unknown).

the minor was using the toilet in other settings. At a visit on December 9, 2024, Mother attempted to serve the children spoiled milk. On the next day's visit, choking hazards, including hardware and screws, and tools were present in the children's play area. Voyles testified that the increase in these reports from visit workers led to the additional referral to Baby Talk and Primed for Life.

¶ 47 As to substance abuse services, Voyles stated that Mother had been asked to complete a substance abuse assessment at HBHC in September 2022. As of February 1, 2023, Mother had not completed the substance abuse assessment. Mother completed the substance abuse assessment on March 21, 2023, and no further services were recommended. Prior to completing the assessment, Mother had been sent for a total of 13 drug screens, beginning in May 2022. Of the 13 screenings, the first one completed in May 2022 was negative, 4 screenings were positive for THC, and the remaining 8 were failures to appear.

¶ 48 Regarding domestic violence, Voyles testified that domestic violence had been a concern throughout the life of the case. The romantic relationship between Mother and Father ended by November 2022. In February 2023 Mother reported that she and Father purchased a car together, and Father was still driving her around. Voyles testified that Mother does not drive.

¶ 49 Voyles testified that a domestic violence incident occurred in September 2022[7] which resulted in Father's arrest. However, when later testifying regarding Father, Voyles testified that Father was arrested and jailed for domestic battery following a December 2022 incident involving Mother. In March 2023 Father was arrested for a new domestic violence incident. In the summer of 2023, Father was arrested after he trespassed in Mother's home and had to be removed by a

_____

[7]A review of the Macon County Circuit Clerk's online docket of court filings indicates that Father was arrested and charged in 22-CF-1575 on December 9, 2022, for domestic battery.

SWAT team. The prior caseworker had concerns that Mother was continuing to allow Father to return to the home.

¶ 50    As to domestic violence services, Mother completed a domestic violence intake in July 2022 and completed 12 sessions between July 2022 and February 1, 2023. Mother was successfully discharged from the domestic violence program on August 21, 2024.

¶ 51    Voyles testified that in the fall of 2024 into the winter of 2025, the prior case worker was concerned that Father or another man was staying with Mother or was at least with her frequently. The man was later identified as Marcel C., who was listed as the father of Mother's youngest child, M.C. There were concerns about Marcel being around the children due to his significant criminal history, history of domestic violence, and history of substance abuse. Marcel's presence in the home led to S.P. and G.R. being removed from Mother's care. Marcel died in February 2025.

¶ 52    As to mental health, Voyles testified that Mother was hospitalized for a mental health incident in February 2022. Mother was diagnosed with bipolar disorder, but she was not recommended for medication. Initially, Mother met with a counselor every other week. Mother was then referred to counseling at WCYA. Mother began counseling at WCYA on August 29, 2022. Between August 2022 and February 1, 2023, Mother attended 11 of 15 sessions. WCYA noted Mother was dealing with an adjustment disorder, depression, and anxiety. Between February and May 23, 2023, Mother's attendance at counseling was poor. She attended about half of her sessions. Between May 23, 2023, and August 10, 2023, Mother attended five sessions. Mother's attendance at sessions improved significantly between August 10, 2023, and February 4, 2024.

¶ 53    Voyles stated that as of May 7, 2024, Mother's counselor reports that she thought Mother was about ready to be finished with counseling for her initial treatment plan. Additional counseling was recommended as maintenance. By late spring 2024 or early summer 2024, Mother had

16

completed the goals set for counseling. However, Mother was not engaging in the continuing counseling for maintenance support. Voyles testified that in October or November of 2024, a new referral was made for Mother to attend counseling. The recommendation was to go along with the recommendations to reengage in parenting services. Voyles testified that she "felt like [Mother] was experiencing a lot of stress from the—the—the difficulties that were being expressed during the visits, so we thought reengagement in counseling would be good for her at that point." She did not reengage with counseling at WCYA, so she was unsuccessfully discharged on February 10, 2025. In January 2025 a referral was made for Mother to engage in counseling at HBHC; she did not engage with HBHC. In mid-April 2025 Mother found a counselor at Crossings and engaged in services there.

¶ 54    Regarding overall personal stability, Voyles testified that Mother had been stable in her housing since Voyles became involved in October 2024. Mother owed a few thousand dollars in back rent to the housing authority, but she was working with a housing advocate to resolve the arrearage.

¶ 55    On cross-examination, Voyles testified that Mother had not tested positive in drug screens for anything other than THC. Voyles was uncertain if the Baby Talk program was intended for parents who currently had the care or custody of their children. However, she testified that the referral was made to assist Mother with the visits in her home that were occurring twice a week for three hours at a time. Voyles stated that Mother was currently engaged in the Primed for Life parenting program and would complete it soon.

¶ 56    Voyles testified that visitation with the minor was currently taking place at a DCFS office closer to all of the children. Voyles had not received any reports from visit workers with serious

17

concerns. Mother's parenting instructor reported to Voyles that she observed some recent visits and that they were positive.

¶ 57 Mother then testified on her own behalf. Regarding substance abuse services, Mother testified that she completed almost all her drug tests, estimating that she missed four. The only substance for which she ever tested positive was THC. Mother testified that she stopped using THC when she learned she was pregnant in February 2025.

¶ 58 As to the most recent recommended parenting services, Baby Talk, Mother testified that it was her understanding that Baby Talk was meant to support parents when the children were in the parents' care. Mother had prior involvement with Baby Talk before the children were removed from her care. Mother testified that she engaged with Primed for Life.

¶ 59 Mother testified that after the romantic relationship with Father ended, they did own a car together. Mother's caseworker at the time warned Mother that it was not a good idea.

¶ 60 Mother testified that Marcel did not live in her home; he stayed with his sister who lived nearby. Because Marcel did not live with her, Mother thought she was not required to report this to DCFS. Mother testified that Marcel was never violent towards her.

¶ 61 Mother testified that after she completed her mental health services and was referred to WCYA again, she told the caseworker that the bus did not go to the facility. Then a referral was made for HBHC, but Mother reported that HBHC told her they did not have a referral for her. Mother then engaged in counseling at Crossings.

¶ 62 Mother also testified that she wanted to be involved in the minor's medical appointments. Mother testified that she was only told about an appointment with an eye doctor.

¶ 63 Father also testified on his own behalf. Father's testimony is not relevant to Mother's case. At the close of Father's testimony, the court heard arguments.

18

¶ 64    In closing, the State asked the court to find that it had proven the allegations of paragraphs 4B, 4E, 4F, and 4H (set forth in their entirety above). The State conceded it did not prove the allegations of paragraph 4D, as to reasonable efforts, and paragraph 4G, as to reasonable progress from September 30, 2023, to June 20, 2024.

¶ 65    The circuit court made oral pronouncements finding that, as to Mother, the State had met its burden as to paragraphs 4F and 4H. As to paragraph 4F, the circuit court stated:

> "I agree with the assessment of the [GAL]. I believe this has been proven by clear and convincing evidence as to [Mother] that she has failed to make reasonable progress throughout the time period December 30, 2022, through September 30 of 2024 (*sic*) for the reasons as stated by counsel both [the GAL] as I've just noted as well as [the State] during this time period to summarize the evidence, but again this Court is considering this in light of the totality of the evidence.
>
> * * *
>
> The evidence I believe supports that [Mother] was freely associating with [Father] throughout this time period. There was a domestic violence issue, and there was the issue where essentially culminated with the SWAT team being involved. There was a car that they shared. There was clearly an ongoing association that went beyond just simply being without more the victim of domestic violence [Mother] was freely associating with [Father] despite what she had as the evidence established in learning throughout domestic violence and other—other services that she was undergoing.
>
> There was also of course the issue of very poor attendance as far as mental health or counseling goes throughout this time period; therefore, the Court is going to find for those reasons and the ones stated by counsel that the State has met their burden as to Paragraph 4F."

As to paragraph 4H, the circuit court stated:

> "As to Paragraph 4H, although I don't believe it was as pronounced as the proof that supported—the evidence support 4F, I believe the State did by clear and convincing evidence meet their burden as to Paragraph 4H for the reasons stated by counsel, specifically throughout—during this period. There were recurring problems with food dye. This minor being exposed to it to which she had an allergy. Choking hazards were present, potty training. She—[Mother] was associating with an individual, [Marcel C.] that had prior domestic violence issues, that had a number of different involvements with the criminal justice system, and that again was in the picture very clearly and this culminated with the children being removed from the house—or this minor being removed from the house. Her other minors we're not dealing with. I agree with [the State.]

19

As [Mother's counsel] accurately pointed out the evidence supported that eventually [Mother] did engage and she did or is well towards completing required services, but that is not throughout the time period of June 13, 2024, through March 13 of 2025. In that time period referrals were made I believe in December and not acted upon until March. There was a three-month span obviously that was at play in there, so based on that and based on again the totality of the evidence, the Court is going to find the State has met their burden as to Paragraphs 4F and 4H by clear and convincing evidence and not as to any other paragraph."

The circuit court also entered an order via docket entry, finding that Mother was an unfit parent for the previously mentioned reasons.

¶ 66    On October 6, 2025, the circuit court held a best interest hearing. The circuit court found that the State had proven by a preponderance of the evidence that it was in the best interest of the minor for Mother's parental rights to be terminated, and made a docket entry regarding the finding the same day. The court's docket entry also stated, "Judgment as to Parental Fitness and Permanent Termination to be filed." On October 7, 2025, Mother filed a notice of appeal. The circuit court entered the written "Judgment as to Parental Fitness and Permanent Termination" on December 15, 2025. Mother's notice of appeal was treated as being filed on the date of December 15, 2025, and after the entry of the judgment.

¶ 67                                    II. ANALYSIS

¶ 68    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). See *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), which delineates a two-step process to terminate parental rights involuntarily. The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit,

the matter proceeds to a second hearing at which the State must prove that termination of parental rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 69 Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *Id*. at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* Further, the decision to find a parent unfit must be based solely on properly admitted evidence. *In re M.D.*, 2022 IL App (4th) 210288, ¶¶ 77, 83. Permanency reports are inadmissible at a fitness hearing; however, service plans are admissible as substantive evidence under the Juvenile Court Act's version of the business records exception. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 82; 705 ILCS 405/2-18(4)(a) (West 2024); *In re A.L.*, 409 Ill. App. 3d 492, 505 (2011); *In re A.B.*, 308 Ill. App. 3d 227, 235 (1999).

¶ 70 A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 71 In this matter, Mother challenges the circuit court's findings that she failed to make reasonable progress toward the return of the minor during the relevant nine-month periods of December 30, 2022, to September 30, 2023, and June 13, 2024, to March 13, 2025. The circuit court found Mother unfit on the basis of reasonable progress as to two 9-month periods alleged by

the State. In a proceeding to terminate parental rights, "[a] parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *Id.* at 349. "This means that, on review, if there is sufficient evidence to satisfy any one statutory ground we need not consider other findings of parental unfitness." *In re M.J.*, 314 Ill. App. 3d at 655.

¶ 72   "Reasonable progress" is an objective standard, based upon the amount of progress as measured from the conditions existing at the time of removal. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21.

> "The benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d at 216-17.

If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill her obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2024). At all times, the overall focus in evaluating a parent's progress towards the return of the child should remain on the fitness of the parent in relation to the needs of the child. *In re C.N.*, 196 Ill. 2d at 216.

¶ 73   In the present matter, the circuit court found that Mother failed to make reasonable progress toward the return of the minor during the 9-month period of December 30, 2022, through September 30, 2023. During this time frame, Mother's service plan required her to complete services for parenting, mental health, domestic violence, complete a substance abuse assessment,

22

and maintain personal stability and cooperation. In explaining its finding that Mother failed to make reasonable progress during this time, the circuit court noted that Mother "was freely associating with [Father]," thus, not making reasonable progress as to domestic violence services. Additionally, the circuit court noted that Mother had "very poor attendance as far as mental health or counseling goes."

¶ 74    First, turning to the evidence regarding Mother's progress toward domestic violence services between December 30, 2022, and September 30, 2023. Voyles testified that the romantic relationship between Mother and Father ended in November 2022. After the relationship ended, Father was arrested for a domestic violence incident in December 2022 and March 2023. The most recent service plan filed with the circuit court indicated that Mother sought an order of protection against Father, but it was denied. The Macon County Circuit Clerk's online docket[8] filings indicate that Mother, in case No. 23-OP-372, filed a *pro se* petition for an order of protection against Father on May 24, 2023. An emergency order of protection was granted, and the case was called for a hearing to determine whether a plenary order would be entered. The circuit court denied the plenary order of protection on July 11, 2023. Thereafter, in August 2023 Father was arrested for trespassing to Mother's residence.

¶ 75    It was against the manifest weight of the evidence for the circuit court to conclude, based on the foregoing, that Mother was not making substantial progress in her domestic violence services for the relevant period. During the relevant time period, Mother and Father were no longer in a romantic relationship. Mother was attending domestic violence services. However, Father engaged in criminal acts against Mother. The circuit court relied heavily on the incident in August

---

[8]An appellate court may take judicial notice of readily verifiable facts, such as a court's online docket entries, if doing so will aid in the efficient disposition of a case. *Asher Farm Limited Partnership v. Wolsfeld*, 2022 Il App (2d) 220072, ¶ 31.

23

2023 which required the SWAT team to remove Father from Mother's residence. Father was arrested for trespass; a necessary element of trespass is that the perpetrator commits the trespass "without authority." 720 ILCS 5/19-4 (West 2022). The circuit court found that Mother was still associating with Father and that she was somehow responsible for Father's trespassing to her residence; the opposite conclusion is clearly apparent from the record. Father was not authorized to be at Mother's residence when he was arrested in August 2023. Further, Mother ended the relationship, and after two incidents of domestic violence against her, she sought an order of protection to keep Father away from her.

¶ 76    Next, as to mental health services in the relevant time period. The circuit court found that Mother had "very poor attendance as far as mental health or counseling goes throughout this time period." Voyles testimony regarding Mother's attendance at mental health services included dates outside of the relevant time period. Voyles stated that between August 2022 and February 1, 2023, Mother attended 11 of 15 sessions. The circuit court was not provided with information regarding how many of these 11 visits occurred between December 30, 2022, the beginning of the relevant time period, and February 1, 2023. Voyles testified that between February and May 23, 2023, Mother attended about half of her sessions. Between May 23, 2023, and August 10, 2023, Mother attended five sessions. Mother's attendance at sessions improved significantly between August 10, 2023, and February 4, 2024. Again, the circuit court was not provided specific details about the "significant improvement" that began on August 10, 2023. This improvement continued through February 4, 2024, and thus, through the end of the relevant 9-month period on September 30, 2023.

¶ 77    Based on this limited testimony provided by Voyles, the evidence was insufficient to conclude that Mother did not make reasonable progress as to her mental health services between December 30, 2022, and September 30, 2022. In order to find a parent unfit, clear and convincing

24

evidence is required. *In re J.J.*, 201 Ill. 2d 236, 247 (2002). Clear and convincing evidence is "the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). The information relied on by the circuit court did not approach the degree of certainty required to support the finding of unfitness. *Id.* at 250. Accordingly, it was against the manifest weight of the evidence to find that Mother failed to make reasonable progress as to her mental health services from December 30, 2022, to September 30, 2023.

¶ 78   Additionally, the circuit court found that Mother failed to make reasonable progress toward the return of the minor during the 9-month period of June 13, 2024, to March 13, 2025. During this time frame, Mother's service plan remained the same and required her to complete services for parenting, mental health, domestic violence, complete a substance abuse assessment, and maintain personal stability and cooperation. In explaining its finding that Mother failed to make reasonable progress during this time, the circuit court noted recurring problems with food dye to which the minor was allergic, choking hazards, and potty training. The circuit court also noted Mother's association with Marcel C. as a reason for finding she had not made reasonable progress. Finally, the circuit court found that Mother did not act upon referrals for services within the 9-month period because referrals were made in December 2024 and Mother did not engage in those services until March 2025.

¶ 79   First, turning to the parenting issues the circuit court noted. The relevant time period is June 13, 2024, to March 13, 2025. Voyles testified there were two visits that occurred between March 23, 2022, and August 10, 2022, in which the minor was served food that contained red dye, which the minor was allergic to. Voyles stated this issue improved into the fall of 2023 and into early winter of 2024, and no incidents with red dye were noted during this time. There was no

25

additional testimony offered regarding incidents of the minor being provided food or beverages containing red dye. As such, the circuit court heard no testimony that the minor was served anything containing red dye within the relevant 9-month period of June 13, 2024, to March 13, 2025. It was against the manifest weight of the evidence to find Mother did not make reasonable progress as to parenting based upon incidents that occurred outside the relevant time period.

¶ 80    Voyles testified that in the summer of 2024, visitation started occurring in Mother's home. Regarding the minor's potty training, Voyles stated that the minor was in the process of potty training in the fall of 2024, and the "reported concerns regarding [S.R.] in the bathroom I believe was just inattentiveness to—to her needs and her potty training and needing to be prompted frequently." The "visit worker noted that mom was just changing the Pull-Up rather than asking if she needed to use the bathroom?" Voyles also testified that at a visit in December 2024 choking hazards, including hardware and screws, and tools were present in the children's play area. As of December 2024 the minor in the present case, S.R., would have been 4-years old. Her siblings, who would also have been present in the home for visitation, were G.G., age 5, G.R., age 3, and S.P., age 1.

¶ 81    From the testimony regarding potty training, it is not clear whether Mother needed to be prompted regarding potty training or if the worker thought Mother should be prompting the minor more frequently to use the bathroom. Also, this testimony shows that Mother was attentive to the child and ensured she was in a clean Pull-Up. There was also testimony about a single incident of choking hazards being present in the play area. Voyles testified generally that small pieces can be choking hazards to children. However, to conclude that Mother is unfit based on potty training difficulties and a single instance of screws, hardware, and a screwdriver, that Voyles said was "presumably from a maintenance worker," is unreasonable.

¶ 82    Based on these incidents, Voyles testified that she thought Mother needed additional parenting services. Voyles referred Mother to additional parenting support resources, Primed for Life and Baby Talk, in December 2024. On cross-examination, Voyles acknowledged that she was uncertain if the Baby Talk program was intended for parents who currently had the care or custody of their children. She also stated that Mother engaged with Prime for Life in March 2025. There was no specific testimony regarding the date the referrals were made in December 2024 or when Mother engaged with Prime for Life in March 2025.

¶ 83    Prior to December 2024 Mother had completed all recommended parenting services. The most recent service plan filed with the circuit court indicated that Mother completed 41 parenting sessions and all 16 parenting competencies in the curriculum. Mother "was successfully closed out of parenting services on 10/2/23."

¶ 84    For the relevant time period of June 13, 2024, to March 13, 2025, for approximately six months, Mother had no recommended parenting services to complete because she had already completed the services and was "successfully closed out of parenting services." Sometime in December 2024 DCFS felt that more services were necessary. While Mother did not immediately engage in those services, she did engage in parenting services sometime in March 2025. However, this also reflected the end of the 9-month period. To find that a 2-3 month delay in re-engaging in parenting services, after no parenting services had been recommended for over a year, as the basis to find Mother did not make reasonable progress is unreasonable.

¶ 85    Finally, the circuit court referenced that Mother associated with Marcel C. and this was a reason to find that Mother did not make reasonable progress. The circuit court's findings mistakenly noted that this was a reason that the minor was removed from Mother; however, this is inaccurate. The minor had not been returned to the physical care of her Mother. Additionally, there

27

was nothing in the service plan that prevented Mother from associating with Marcel. There was no evidence presented that Marcel resided with Mother; this assertion was based upon the speculation of a prior caseworker. Further, Marcel died in February 2025. It is unreasonable and arbitrary to find Mother unfit based on a requirement to not associate with Marcel, which was not part of the service plan.

¶ 86    The evidence presented shows that Mother was making progress toward the return of the minor. As set forth above, the benchmark for measuring reasonable progress includes "the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d at 216-17. In this case, the minor was taken into care because the mother had an isolated mental health incident that required hospitalization. This issue has not occurred again. Mother completed services and was working toward the minor's return.

¶ 87    Although we give great deference to the circuit court, we find that the evidence presented in this matter does not support the findings of unfitness based on Mother's failure to make reasonable progress during the 9-month periods of December 30, 2022, to September 30, 2023, and June 13, 2024, to March 13, 2025. Accordingly, we reverse the judgment of the circuit court terminating Mother's parental rights with regard to S.R. Upon return of this matter to the circuit court, we anticipate that DCFS will reengage with Mother and provide any necessary services to assist Mother in her continuing process. As we reverse the fitness finding, there is no need to address the best interest determination.

28

¶ 88                              III. CONCLUSION

¶ 89    Based on the foregoing, we find the circuit court's findings that Mother was an unfit person for failing to make reasonable progress for the two time periods were against the manifest weight of the evidence. Therefore, we reverse the December 15, 2025, judgment of the circuit court of Macon County terminating Mother's parental rights with regard to S.R.


¶ 90    Reversed.